Sarah K. McMillan, *pro hac vice* pending (MT Bar #3634)
WildEarth Guardians
Post Office Box 7516
Missoula, MT 59807
(P) 406.549.3895 (F) 505.213.1895
smcmillan@wildearthguardians.org

Dana Johnson (ID State Bar # 8359)
Law Office of Dana Johnson, PLLC
djohnson@lodj.legaloffice.pro
P.O. Box 9623, Moscow ID 83843
(P) 208.310.7003  (F) 208.310.7004

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
EASTERN DIVISION

| | |
|---|---|
| **WILDEARTH GUARDIANS, PROJECT COYOTE, WESTERN WATERSHEDS PROJECT, BOULDER-WHITE CLOUDS COUNCIL, ANIMAL WELFARE INSTITUTE,** | |
| Plaintiffs | Case No. 4:13-cv-533 |
| v. | |
| **CHARLES A. MARK**, in official capacity as Forest Supervisor of the Salmon-Challis National Forest, **NORA RASURE,** in official capacity as Regional Forester for Region Four, **THOMAS TIDWELL**, in official capacity as Chief of the U.S. Forest Service, and **U.S. FOREST SERVICE**, a federal agency, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |
| _____ | |

# INTRODUCTION

1.      Pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., Plaintiffs WildEarth Guardians, Project Coyote, Western Watersheds Project, Boulder-White Clouds Council, and Animal Welfare Institute (collectively, "Plaintiffs" or "Guardians") challenge as arbitrary and capricious the Federal Defendants' decision that a special use permit is not required for a two day Coyote and Wolf Derby ("Killing Contest") on December 28-29, 2013 that will begin in Salmon, Idaho and include access to lands under the jurisdiction of the U.S. Forest Service ("USFS").  The USFS failed to follow its own procedures for reviewing special uses and violated the National Environmental Policy Act ("NEPA") by failing entirely to consider the environmental impacts of allowing the Killing Contest on USFS lands as well as impacts on other USFS users. 42 U.S.C. § 4321 *et seq*.

2.      This civil action arises from permitting decisions by Defendant (hereafter "the Agency" or "USFS") for a two day "Coyote and Wolf Derby" that sponsors have advertised for December 28-29, 2013.  The Killing Contest is a contest hunt specifically targeting wolves and coyotes.  The Killing Contest advertisement explains that contestants may enter the event for a $20 entry fee and that shooting will occur on public and private lands on December 28 and 29.  The event flyers and online advertisements also announce that thousand dollar cash prizes and trophies will be awarded for the largest wolf killed and for the highest numbers of coyotes killed, that door prizes and other prizes for largest male and largest female coyotes, most female coyotes, and for youth participants will be awarded, and that furbuyers will be on hand.  The announcement limits the hunt to Idaho and requires in-person registration in Salmon, between 4-8pm on December 27, with prizes awarded in Salmon on December 29.

1 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

3. One December 11, the Salmon-Challis USFS office informed Guardians it was unaware of the Killing Contest but that such an event would require a permit and that the matter would be referred to the Forest Service law enforcement division.  In a complete reversal, on December 17, 2013, the Salmon-Challis USFS office informed Guardians that it did not intend to require a special use permit for the event to occur on the public lands it administers. On December 19, the Regional Supervisor declined to reconsider that decision in writing and provided an explanation of its reasoning.  This Contest will occur with potentially 300 or more contestants shooting coyotes and wolves over two days on the National Forest around Salmon, Idaho.

## JURISDICTION AND VENUE

4. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because it raises a federal question arising under the laws of the United States.  The Court has the authority to review the Agencies' action and/or inaction complained of herein, and grant the relief requested, pursuant to the APA, 5 U.S.C. § 701 *et seq*.  Plaintiffs are challenging a final agency action that was inconsistent with the agency's own regulations and failed to comply with NEPA and have exhausted all available administrative remedies by seeking to resolve this controversy without recourse to the judicial system.

5. The relief sought is authorized by 28 U.S.C. § 2201 (Declaratory Judgment), 28 U.S.C. § 2202 (Injunctive Relief), and 5 U.S.C. § 706 (APA).  Venue is proper before this Court pursuant to 28 U.S.C. § 1391(e).  The December 28-29 Killing Contest that USFS has decided, without NEPA review, to allow on the public lands they administer will start in Salmon, Idaho, will occur in Idaho and the decision was made by the USFS office in Salmon, Idaho.

6. A present and actual controversy exists between the Parties.

## PARTIES

7. Plaintiff WILDEARTH GUARDIANS ("Guardians") is a 501(c)(3) non-profit, public interest, environmental advocacy and conservation organization with over 35,000 members and e-activists. Founded in 1989 as Forest Guardians, WildEarth Guardians' mission is to protect and restore wildlife, wild rivers and wild places in the American West. WildEarth Guardians works to protect imperiled plants and animals, to protect and restore wild places and healthy ecosystems, and to ensure careful and protective management of federal public lands. Protecting native carnivores is a Guardians priority campaign.

8. Plaintiff BOULDER-WHITE CLOUDS COUNCIL ("BWCC") is a 501(c)3 non-profit conservation group headquartered in Ketchum, Idaho. BWCC was founded in 1989, to protect as Congressionally-designated Wilderness, the 550,000-acre Boulder-White Cloud Mountains in central Idaho. The Boulder-White Clouds lie mostly within the Salmon-Challis National Forest as well as adjoining BLM lands managed by the Challis Field Office. BWCC's mission has since expanded to other nearby areas including the Lost River Range, Pasimeroi, Lemhi and Pioneer Mountains on the Salmon-Challis National Forest and BLM lands. BWCC also works on issues relating to mining, grazing, timber, recreation, and imperiled species (with particular emphasis on wolves). With 800 supporters, BWCC works to educate its members, the public-at-large and the media, on why preserving the Boulder-White Clouds and surrounding mountain ranges is important, for current and future generations of humans and wildlife. The Boulder-White Cloud Mountains are the largest, unprotected roadless area left on Forest Service lands in the Lower 48 states. The headwaters of the famous Salmon River is near Galena Summit, and the Salmon River flows along the western and northern edge of the White Cloud

Mountains. BWCC's supporters fish and raft on the Salmon River, which flows through the towns of Stanley, Challis and Salmon. All along the River corridor and the adjoining Salmon-Challis Forest and BLM lands, BWCC and its supporters hike, mountain bike, ride horses and ATVs, gather mushrooms, cut firewood, explore old mine ruins, rock hound, cross country ski, snowmobile, and especially enjoy observing and photographing wildlife.

9. Plaintiff PROJECT COYOTE is a national 501(c)(3) non-profit wildlife conservation organization working to promote coexistence between people and wildlife through education, science and advocacy. Headquartered in Northern California with more than 4,400 supporters and constituents worldwide, Project Coyote aims to create a shift in attitudes toward coyotes and other native carnivores by replacing ignorance and fear with understanding and appreciation. Project Coyote accomplishes its mission by championing progressive management policies that reduce human-coyote conflict, by supporting innovative scientific research, and by fostering respect for and understanding of America's apex predators. Project Coyote has supporters in the Salmon, Idaho region who recreate on public lands in Idaho enjoying wildlife watching, photography and camping. They value seeing coyotes, wolves, and other predators in the wild. Project Coyote also has supporters and state representatives and science advisory board members who visit Idaho specifically to see coyotes, wolves, bears and other wildlife. They often camp – sometimes with their children and families – and avoid areas and seasons when there may be conflicts with hunters.

10. Plaintiff WESTERN WATERSHEDS PROJECT's ("WWP") mission is to protect and restore western watersheds and wildlife through education, public policy initiatives and litigation. WWP is a 501(c)(3) non-profit conservation group founded in 1993 with 1,400 members and with field offices in Idaho, Montana, Utah, Wyoming, Arizona and California.

4 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

WWP is headquartered in Hailey, Idaho and manages the Greenfire Preserve in Clayton, Idaho.  The group works to influence and improve public lands management throughout the West with a primary focus on the negative impacts of livestock grazing on 250,000,000 acres of western public lands, including harm to ecological, biological, cultural, historic, archeological, scenic resources, wilderness values, roadless areas, Wilderness Study Areas and designated Wilderness. WWP's members and/or staff have used and have concrete plans to continue to use these public lands around Salmon for scientific, educational, recreational (including hiking, camping, photography, wildlife viewing, and botanizing), aesthetic, and spiritual purposes.

11. Plaintiff the Animal Welfare Institute ("AWI") is a non-profit, public interest, animal protection organization founded in 1951 and dedicated to reducing animal suffering caused by people.  In connection with its work to protect imperiled animals, AWI petitions for species to be added to the list of Endangered and Threatened Species under the U.S. Endangered Species Act.  AWI advocates for increased protection for predators and other wildlife via various means such as challenging lethal predator control programs implemented by state and federal agencies, and funding scientists to develop and study non-lethal strategies to mitigate human-wildlife conflicts.  AWI has over 31,300 constituents including approximately 80 who reside in Idaho.  AWI and its members are extremely concerned about the well-being and management of wolves and coyotes in Idaho and elsewhere, and has a substantial interest in the protection, conservation, and humane treatment of these and other species.  The interests of AWI and its constituents are harmed by the planned wolf and coyote contest hunt, as this may impact the ability to observe, photograph, and otherwise enjoy these animals in their natural habitats and because the contemplation of these important predators being used as targets in a killing contest for prizes is unsettling, ethically indefensible, and antithetical to the importance of these animals

5 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

in a healthy and properly functioning ecosystem.

12. Plaintiffs' members and staff live and work near and in Salmon and recreate on and the public lands at issue in this matter. As set forth in the accompanying declarations, Plaintiffs' members and staff use the areas affected by the USFS's decision for observation, research, photography, nordic skiing, snowshoeing, snowmobiling, hiking, aesthetic enjoyment, and other scientific, educational, and recreational activities. Plaintiffs' members and staff derive scientific, recreational, conservation, and aesthetic benefits from using the areas where the trail grooming occurs. Plaintiffs' members enjoy viewing, studying sign of, and being aware of wildlife in the area, particularly wolves and coyotes. Plaintiffs' members have concrete plans to continue to engage in these activities on these lands, including during the December 28-29, 2013 Killing Contest time period.

13. The USFS's failure to follow its own regulations relating to special use authorization and its failure to comply with NEPA in authorizing the Killing Contest on the public lands it manages results in uninformed decisions and creates an increased risk of actual, threatened, and imminent harm to Guardians' members concrete interests in the public lands and Salmon-Challis particularly. These harms include, but are not limited to: 1) disruption of their recreation experiences by confronting many more people shooting; 2) reduction and impairment of recreation opportunities; 3) impacts to native plants and wildlife and their habitats; 4) Disruption of their use of public lands for fear of hearing more gunshots or seeing dead animals; and 5) reduced likelihood that they will observe wildlife both during the Killing Contest and after hundreds of animals have been killed. The USFS's failure to comply with its special use regulations and NEPA adversely affects the interests of Plaintiff organizations and their respective staffs and members. These injuries would be redressed by the relief sought in this

Complaint. Guardians bring this action on their own behalf and on behalf of their adversely affected members.

14. Defendant MARK CHUCK is named in his official capacity as the Forest Supervisor for the Salmon-Challis National Forest. As the Forest Supervisor, Mr. Chuck is the federal official with responsibility for all USFS officials' action/inactions on the Salmon-Challis Forest challenged in this complaint.

15. Defendant NORA RASURE is named in her official capacity as the Regional Forester for Region 4 of the USFS. As the Regional Forester, Ms. Rasure is the federal official with responsibility for all USFS officials' inactions or actions in the Forests within Region 4 challenged in this complaint.

16. Defendant TOM TIDWELL in his official capacity as the Chief of the USFS. As the Chief of the USFS, Mr. Tidwell is the federal official with responsibility for all USFS officials' actions/inactions in the National Forest challenged in this complaint.

17. Defendant UNITED STATES FOREST SERVICE is an agency within the U.S. Department of Agriculture that is responsible for applying and implementing the federal laws and regulations challenged in this complaint.

## LEGAL FRAMEWORK

### A. The Administrative Procedures Act

18. The APA provides for judicial review by individuals aggrieved or adversely affected by agency action. 5 U.S.C. §702. The law provides that when "agency action, findings, or conclusions" are found to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "(D) without observance of procedure required by law" the

reviewing court shall hold unlawful and set aside those actions, findings, and conclusions. 5 U.S.C. §706(2).

### B. Applicable Forest Service Regulations

19. The USFS's regulations provide that "[a]ll uses of National Forest System lands … are designated 'special uses'" that require permits, unless the permit requirement is specifically waived by paragraphs (c) through (e)(3) of the regulations. 36 C.F.R. § 251.50.

20. Commercial use is defined as "any use or activity on National Forest System lands (a) where an entry or participation fee is charged . . ." 36 C.F.R. § 251.51. Noncommercial activities on National Forest System lands such as hiking, hunting, and fishing do not require special use permits unless a non-commercial group of 75 or more people (either as participants or spectators) will be there, in which case a special use permit is required. 36 C.F.R. § 251.50(c), § 251.51 (defining non-commercial group as 75 or more).

21. A special use permit is required for all commercial activities unless the commercial activity has one or more of the following characteristics:

> (1) The proposed use will have such nominal effects on National Forest System lands, resources, or programs that it is not necessary to establish terms and conditions in a special use authorization to protect National Forest System lands and resources or to avoid conflict with National Forest System programs or operations;
>
> (2) The proposed use is regulated by a State agency or another Federal agency in a manner that is adequate to protect National Forest System lands and resources and to avoid conflict with National Forest System programs or operations; or
>
> (3) The proposed use is not situated in a congressionally designated wilderness area . . .

36 C.F.R. § 251.50(e)(1-3).

22. If a use or activity on Forest System Lands will entail travel on Forest Service roads, a permit is required if it is for a non-commercial group, outfitting or guiding, or a recreation event. 36 C.F.R. § 251.50(d). A recreation event is defined as "a recreational activity

8 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

conducted on National Forest System lands for which an entry or participation fee is charged, such as … races; dog trials; fishing contests;…" 36 C.F.R. § 251.50(d). Thus a recreation event that charges an entry fee, a non-commercial group event (for hunting, hiking, etc.), and commercial events may not use Forest System lands without special use permits.

23. The Forest Service's procedure for reviewing an application for a special use permit consists of a three level screening process. 36 C.F.R. § 251.54(e). In the first step of that process, USFS screens a proposal to ensure it is consistent with management purposes, other uses, will not pose a serious or substantial risk to public health or safety, etc. If the proposal does not meet every one of the criteria, the USFS must reject the proposal.

24. If the proposal passes the first level, the second level requires USFS to reject the proposal if, among other things, it is not in the public interest or is inconsistent with other uses.

25. If the proposal passes the first two levels, USFS informs the applicant to submit a formal application, which then requires compliance with NEPA, including its notice and opportunity for comment provisions. 36 C.F.R. § 251.54(g).

26. USFS failed to comply with its decision its special use regulations. These regulations also require compliance with NEPA.

    C.    **The National Environmental Policy Act**

27. NEPA aims to "encourage productive and enjoyable harmony between man and his environment" and to promote government efforts "which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. As the Council on Environmental Quality ("CEQ") regulations implementing NEPA explain, the law "is our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a).

28.     Under NEPA, a federal agency must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C)(i); 40 C.F.R. § 1501.4. In the EIS, the agency must, among other things, rigorously explore and objectively evaluate all reasonable alternatives, analyze and assess all direct, indirect, and cumulative environmental effects, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§ 1502.14 and 1502.16.

29.     Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

30.     An agency may also prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. §§ 1501.3, 1508.9. An EA must include a discussion of alternatives and the environmental impacts of the action. 40 C.F.R. § 1508.9.

31.     If an agency decides not to prepare an EIS, an EA must "provide sufficient evidence" to support a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1501.4(e). Such evidence must demonstrate that the action "will not have a significant effect on the human environment[.]" 40 C.F.R. § 1508.13. An assessment of whether or not an impact is "significant" is based on a consideration of the "context and intensity" of the impacts. 40 C.F.R. § 1508.27. "Context" refers to the scope of the proposed action, including the interests affected. 40 C.F.R. § 1508.27(a). "Intensity" refers to the severity of the impact and must be evaluated

10 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

with a host of factors in mind, including "[t]he degree to which the proposed action affects public health or safety" and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b).

32.     Federal agencies must "[m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures." 40 C.F.R. § 1506.6(a). To the fullest extent possible, agencies must "[e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment." 40 C.F.R. § 1500.2(d). At a minimum, agencies must "[p]rovide public notice of . . . the availability of environmental documents so as to inform those persons and agencies who may be interested or affected." 40 C.F.R. § 1506.6(b).

## FACTUAL BACKGROUND

33.     Salmon, Idaho is situated in Lemhi County, which consists of approximately 90% federal public lands. The federal public lands surrounding Salmon, Idaho contain some of the wildest roadless lands in the federal public lands systems. The Salmon-Challis National Forest includes approximately 1.3 million acres of the Frank Church-River of No Return Wilderness Area (the second largest Wilderness in the lower 48 states); the Wild and Scenic Salmon River, breathtaking scenery, and countless rugged and remote peaks and river bends. The public lands administered by the BLM in the Salmon area include a portion of the Boulder-White Clouds Mountains, which is one of the largest unprotected roadless areas in the United States. These public lands and the wildlife they sustain are beloved by not only by Guardians staff and members, but by people from across the world who come to Idaho to see some of its splendors, to hike, to watch wildlife, take photographs, raft its wild and scenic rivers, ride horses, and to fish and hunt. Tourism in Idaho is a $3.4 billion industry, employing 26,000 Idahoans. *See* http://commerce.idaho.gov/tourism-resources. This area also includes the only gray wolf

reintroduction site outside of Yellowstone National Park.  In 1995 and 1996 the U.S. Fish and Wildlife Service reintroduced gray wolves into Idaho in an effort to prevent extinction of the gray wolf in the lower 48 states.  That core reintroduction area was in the Frank Church-River of No Return Wilderness area on lands jointly managed by the Salmon-Challis and Boise National Forest.  Idaho remains one of the few and best places to view gray wolves in the wild.

34.     The Salmon Chapter of Idaho for Wildlife, along with 21 additional sponsors including a number of outfitters and sporting goods stores, are sponsoring the "First Annual Coyote and Wolf Derby" on December 28-29, 2013.  This Derby, or Killing Contest, is a sponsored commercial event where participants are required to pay an entry fee, and monetary prizes are awarded for the largest wolf killed, the most coyotes killed, the largest male and female coyotes killed, and the most female coyotes killed.  Prizes for youth participants, in 10-11 year old and 12-14 year old categories are also advertised.  The advertisement for the Killing Contest states that it will take place on public lands and private lands with permission.

35.     The Killing Contest's participants register and obtain rules in Salmon, Idaho from 4-8pm on December 27, 2013, followed with two days of killing as many coyotes and wolves as possible on private and public lands.  The contest concludes in Salmon, Idaho on December 29, 2013 with thousand-dollar cash prizes and trophies awarded for the largest wolf killed and for the highest numbers of coyotes killed; door prizes and other prizes for largest male and largest female coyotes killed, and most female coyotes killed and special prizes for youth participants  The advertisement further provides that fur buyers will be available for those looking to sell the pelts of animals they have killed.

36.     Neither the USFS nor the BLM had heard of the two-day Killing Contest when Plaintiffs contacted the agencies during the second week of December 2013 to inquire if the

12 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Contest sponsors had submitted permit applications to the agencies and if the agencies were reviewing any such applications.

37. As of December 18, 2013, the BLM informed Plaintiffs there were between 20 and 30 teams (with 40-60 participants) already registered. On December 20th, the media reported the Killing Contest sponsors are expecting 300 participants.

38. For several days, through phone calls and emails, Plaintiffs attempted to discover what processes the agencies were using for permitting the Killing Contest on public lands. On December 17, 2013, Plaintiffs learned that despite earlier statements to the contrary, the USFS had determined that no permit was necessary for the contestants to kill wolves and coyotes on USFS lands.

39. On December 18, 2013 Plaintiffs also learned that the Contest sponsors, Idaho Fish and Game officials, and BLM and USFS officials were meeting to work out a solution to the permitting issue.

40. Although the sponsors estimate the contest will draw 300 participants to federal public lands to shoot as many coyotes and wolves as possible over the course of two days, in contravention of the plain language of its own regulations and without following its special use procedures, USFS decided no special use authorization was required.

41. The USFS conducted no environmental review or analysis prior to telling the sponsors the Killing Contest could occur on federal public lands. USFS did not even require a permit application.

42. This Killing Contest occurs in the middle of the holidays on the weekend between Christmas and New Years. During this time, many families have time away from work, can and plan to recreate on public lands, and head out to test out new skis, snowshoes, sleds, snowsuits,

13 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

snowmobiles and other recreation equipment.  The Killing Contest concentrates shooters on public lands in three ways: in time, in place, and in purpose: to shoot as many coyotes and wolves as possible in the two-day timeframe.  Yet the USFS ignored the regulation mandating permits for commercial events, failed to conduct even the first step of its 3 level special use permitting process.

43. The USFS failed entirely to comply with NEPA's requirements.  USFS did not even consider what the direct, indirect, and cumulative impacts of the Killing Contest might be to the human and natural environment on public lands. USFS failed to analyze whether the contest might raise an issue of conflicts with other users, raise safety issues, whether the effects would be controversial, or whether it would have significant impact on wildlife.

44. Significant impact to both wildlife and the human environment will result from the Killing Contest.  The exact extent of the impacts are not known, both because the USFS conducted no environmental analysis and because the extent of impacts will depend on how many contestants register and how many animals they kill.  There are likely to be many more shots fired because of the competitive nature of the Killing Contest, causing concerns for the safety for humans, their pets, and other wildlife; disturbing users seeking to recreate on the public lands, and disturbing other wildlife at a time when wildlife is already feeling the strain of winter.

45. Guardians sought to resolve this controversy without recourse to the Court by communication by phone and email with multiple agency staffers and by sending letters to the Forest Service detailing Guardians' concerns and asking the agency to prohibit the use without special use permits.  Guardians sent a letter to the Forest Service on December 17, 2013, asking the USFS to reconsider its decision allowing the Contest to use USFS lands without a permit and

without any NEPA compliance.  The USFS responded on December 19 ("USFS Response") confirming its decision not to require a permit for the Killing Contest on USFS lands.  In contrast, the Bureau of Land Management responded that it was requiring a special use permit, that the Killing Contest sponsors were informed of the requirement and that no completed permit application had yet been received.

46. The USFS Response states that no special use authorization was required because the Killing Contest "is not a commercial event occurring on NFS land."  The USFS goes on to say that "[t]he organized event does not consist of hunting on the National Forest . . . ." because the USFS has decided the activity of the Contest is simply "the offering of a prize for wildlife taken by recreational hunting."

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the APA—USFS's Decision that a Permit was not Required for the Killing Contest was Arbitrary and Capricious, not in Accordance with the Law, and was Made Without Observance of Procedure**

47. Guardians hereby incorporate and restate all preceding paragraphs.

48. The USFS's decision that a permit is not required for the Killing Contest participants to kill wolves and coyotes on USFS lands is a final agency action.

49. The Killing Contest is both a commercial and recreation event under USFS regulations, both of which are prohibited without a permit pursuant to 36 C.F.R. § 251.50.

50. USFS made its unlawful decision without observing the regulatory procedures in 36 C.F.R. § 251.54 for reviewing such proposed uses.

51. USFS's determination that the Killing Contest a commercial or recreation and does not require a special use permit for its activities on USFS lands, is "arbitrary, capricious, an

15 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

abuse of discretion, or otherwise not in accordance with law" that was made "without observance of procedures required by law." 5 U.S.C. § 706 (2).

## SECOND CLAIM FOR RELIEF

### Violation of NEPA—USFS Entirely Failed to Comply with NEPA

52. Guardians hereby incorporate and restate all preceding paragraphs.

53. NEPA requires federal agencies to take a "hard look" at the environmental consequences of their actions. 42 U.S.C. § 4332. NEPA's implementing regulations require the USFS to analyze the direct and indirect impacts of the Killing Contest on USFS lands to other USFS users and to wildlife, as well as the cumulative environmental impacts when added to other past, present, and reasonably foreseeable future actions, including cumulative and similar actions, and to assess their significance. *See* 40 C.F.R. §§ 1508.25(a)(2),(3), 1508.25(c)(3), 1508.7.

54. The USFS violated NEPA by failing to evaluate the environmental effects of the Killing Contest on USFS lands. The USFS's failure to analyze the direct, indirect, and cumulative impacts of the Killing Contest was arbitrary and capricious, and constitutes a violation of NEPA. 5 U.S.C. §§ 702-706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A. Issue a declaratory judgment that the USFS's decision as alleged herein violated NEPA and the USFS's own regulations;

B. Issue a temporary restraining order/ enjoining the USFS from authorizing the Killing Contest on their lands without requiring a special use permit pending resolution of this matter by this Court, or resolution of a preliminary injunction motion if such a motion is necessary.

16 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

C. Issue a mandatory injunction ordering USFS to prohibit the Contest from using the USFS lands without a special use permit, and to inform Contest sponsors of such requirement;

D. Issue a mandatory injunction requiring USFS to comply with its own special use regulations and NEPA to review and process such an application;

E. Issue such injunctive relief as Plaintiffs may subsequently request or that this Court may deem appropriate;

F. Retain continuing jurisdiction of this matter until USFS fully remedies the violations of law complained of herein;

G. Grant Plaintiffs their costs and expenses of litigation, including reasonable attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C § 2412;

H. Grant such other relief as this Court deems just and proper.


RESPECTFULLY submitted this 23rd day of December, 2013.

/s/   Sarah K. McMillan                    /s/   Dana Johnson

*pending admission pro hac vice*
Sarah K. McMillan (MT Bar # 3634)          Dana Johnson (ID Bar #8359)
WildEarth Guardians                        Law Office of Dana Johnson, PLLC
P.O. Box 7516,                             P.O. Box 9263,
Missoula, MT 59807                         Moscow, ID 83843
smcmillan@wildearthguardians.org           djohnson@lodj.legaloffice.pro


*Attorneys for Plaintiffs*

17 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2013, I electronically filed the foregoing along with all referenced exhibits and declarations with the United States District Court for the District of Idaho via the CM/ECF system.

As no defendant has yet filed an appearance on the case, I provided a courtesy copy by email to Joshua Hurwit, at the U.S. Attorney's office for the District of Idaho, and hereby certify that on December 23, 2013, I sent identical copies of the foregoing document and all referenced exhibits to the following (all defendants) via certified mail:


Attorney General Holder Jr.
U.S. Dept. of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530

Civil Process Clerk
U.S. Attorney
800 Park Blvd., Suite 600
Boise, ID 83712

Chief Tidwell
U.S. Forest Service
1400 Independence Ave. SW
Washington, DC 20250-0003

Region 4 Forester Nora Rasure
U.S. Forest Service
Federal Building
324 25th Street
Ogden, UT  84401

 Forest Supervisor Chuck Mark
1206 S. Challis St.
Salmon, ID 83467

/s/   Dana Johnson

18 – PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF